**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MATTHEW WARCIAK, individually and on
behalf of all others similarly situated,

              *Plaintiff,*

      v.

ONE, INC., a Delaware corporation,

              *Defendant.*

Case No. 1:16-cv-07426

Hon. Matthew F. Kennelly

**PLAINTIFF MATTHEW WARCIAK'S RESPONSE IN
<u>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................... 1

II.  BACKGROUND ................................................................................................... 2

    A.  Defendant's After School App and "spam-viting" scheme. ................................... 2

    B.  Mr. Warciak's experience. ..................................................................................... 4

III.  LEGAL STANDARD ........................................................................................... 5

IV.  ARGUMENT ........................................................................................................ 5

    A.  Mr. Warciak states a TCPA claim because, under the "totality of the facts and circumstances" of this case—in which App users had no idea that they were inviting anyone to do anything—Defendant made the text message calls. ........... 5

        *1.  The TCPA and the 2015 Order.* ................................................................. 6

        *2.  The fact that users were deceived into selecting contacts so that Defendant could send invitation texts makes Defendant subject to liability under the TCPA.* ............................................................................. 8

        *3.  Defendant cannot evade TCPA liability by failing to inform App users that invitations would be sent to their contacts.* ................................... 9

        *4.  App users made no "affirmative choices" to send text messages.* ............ 10

    B.  Mr. Warciak states an ICFA claim because the sending of unsolicited text messages is an unfair business practice and because he has sufficiently pleaded actual damages. ............................................................................................... 12

        *1.  Mr. Warciak has plausibly alleged that Defendant engaged in an unfair business practice.* .................................................................................... 12

        *2.  Mr. Warciak has adequately pleaded actual damages.* ........................... 14

V.  CONCLUSION .................................................................................................... 15

## **TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................................ 5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................................ 5

**United States Circuit Court of Appeals Cases**

*Fednav Int'l Ltd. v. Cont'l Ins. Co.,*
    624 F.3d 834 (7th Cir. 2010) ......................................................................................... 5

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) ......................................................................................... 6

**United States District Court Cases**

*Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortgage Loan Trust, Series 2003-1,*
    787 F. Supp. 2d 747 (N.D. Ill. 2011) ...................................................................... 12, 13

*Centerline Equip. Corp. v. Banner Pers. Serv., Inc.,*
    545 F. Supp. 2d 768 (N.D. Ill. 2008) ...................................................................... 14, 15

*Cour v. Life360, Inc.,*
    No. 16-CV-00805-TEH, 2016 WL 4039279 (N.D. Cal. July 28, 2016) .................... 9, 11

*G.M. Sign, Inc. v. MFG.com, Inc.,*
    No. 08 C 7106, 2009 WL 1137751 (N.D. Ill. Apr. 24, 2009) ...................................... 14

*Huricks v. Shopkick, Inc.,*
    No. C-14-2464 MMC, 2015 WL 5013299 (N.D. Cal. Aug. 24, 2015) ...................... 9, 11

*In re Google, Inc. Privacy Policy Litig.,*
    No. C-12- 01382-PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) ........................... 15

*Nelson v. Ashford Univ., LLC,*
    No. 16-CV-3491, 2016 WL 4530325 (N.D. Ill. Aug. 29, 2016) ................................... 15

*Thrasher-Lyon v. Illinois Farmers Ins. Co.,*
    861 F. Supp. 2d 898 (N.D. Ill. 2012) .......................................................................... 15

*Wright v. Lyft, Inc.,*
    No. 2:14-cv-00421, Dkt. 63 (W.D. Wash May 15, 2016) .................................. 10, 11, 15

**Illinois Supreme Court Cases**

*Lee v. Nationwide Cassel, L.P.*,
    675 N.E.2d 599 (Ill. 1996) ........................................................................... 13

*Robinson v. Toyota Motor Credit Corp.*,
    775 N.E.2d 951 (Ill. 2002) ........................................................................... 12

*Stern v. Norwest Mortg., Inc.*,
    688 N.E.2d 99 (Ill. 1997) ............................................................................. 13

**Illinois Appellate Court Cases**

*Martis v. Pekin Memorial Hospital, Inc.*,
    917 N.E.2d 598 (Ill. App. Ct. 2009) ............................................................ 13

*Morris v. Harvey Cycle & Camper, Inc.*,
    911 N.E.2d 1049 (Ill. App. Ct. 2009) .......................................................... 14

**Statutory Provisions**

47 U.S.C. § 227(a)(1) ............................................................................................ 6

47 U.S.C. § 227(b)(1)(A)(iii) ................................................................................ 6

47 U.S.C. § 227(b)(2) ............................................................................................ 6

815 ILCS 505/10a(a) ........................................................................................... 14

815 ILCS 505/2Z ................................................................................................. 12

**Other Authorities**

*Affirmative*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/affirmative
    (last visited Oct. 20, 2016) .......................................................................... 10

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd.
    14014 (July 3, 2003) ..................................................................................... 6

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd.
    7961 (July 10, 2015) ............................................................................. *passim*

Matt Burns, *After School App Again Pulled from the App Store after More School Shooting
    Threats*, TechCrunch, Dec. 11, 2014, https://techcrunch.com/2014/12/11/after-school-
    app-again-pulled-by-apple-after-more-school-shooting-threats/ ....................... 2

Sarah Perez, *Video Texting App Glide is Going "Viral," Now Ranked Just Ahead of Instagram in
    App Store*, TechCrunch, July 24, 2013, http://techcrunch.com/2013/07/24/video-texting-
    app-glide-is-going-viral-now-ranked-just-ahead-of-instagram-in-app-store/ ...... 1

Sarah Perez, *When Growth Hacking Goes Bad*, TechCrunch, Jan. 3, 2014, http://techcrunch.com
/2014/01/03/when-growth-hacking-goes-bad ................................................................ 1

## I.    INTRODUCTION

Defendant One, Inc. ("Defendant" or "One") argues that it has no liability under the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227, because the text messages at issue in this suit were initiated by its user base. Relying on the Federal Communications Commission's ("FCC") 2015 Declaratory Ruling and Order (the "2015 Order"), Defendant argues that because users of its social network are the ones supposedly deciding who to text, when to text, and what to text, they—and not Defendant—were the ones to "initiate" or "make" the text message calls, and thus, only they—and not Defendant—could potentially be held liable for any unwanted texts. Defendant's arguments border on specious.

The truth is that, through the registration process of its mobile application (the "After School App" or the "App"), Defendant completely conceals and misrepresents the fact that text messages will be sent to contacts when someone signs up for Defendant's social network. That fact—alone—that Defendant misleads its user base about the sending of text messages (or any kind of communication) as part of the registration process is what distinguishes this case from those cited in the 2015 Order where the users were deemed to have initiated the text messages, as well as the out-of-district opinions that Defendant relies on in urging dismissal. And, while Defendant attempts to create the impression that the sign-up process is set up to ensure only high school students are able to join its network, the reality is that Defendant is simply engaging in the questionable method of growing their user base known as "spam-viting" or "growth hacking."[1]

---

[1]      *See* Sarah Perez, *When Growth Hacking Goes Bad*, TechCrunch, Jan. 3, 2014, http://techcrunch.com /2014/01/03/when-growth-hacking-goes-bad/ (noting that social network applications "are among the worst offenders" of text message growth hacking.); *see also* Sarah Perez, *Video Texting App Glide is Going "Viral," Now Ranked Just Ahead of Instagram in App Store*, TechCrunch, July 24, 2013, http://techcrunch.com/2013/07/24/video-texting-app-glide-is-going-viral-now-ranked-just-ahead-of-instagram-in-app-store/ (referring to the action of an application accessing a user's contact lists and sending pre-written invitational text messages as "*spam-vit[ing]*").

Such is the case here, and it's what makes Defendant liable for the unauthorized and unwanted text messages at issue.

Regarding Plaintiff's ICFA claim, Defendant argues that it fails because an unfair business practice cannot be predicated on a violation of the TCPA for two supposed reasons: the statute (1) is not listed in 815 ILCS 505/2Z, and (2) is "unsettled." Both arguments are seriously misguided. As an initial matter, Plaintiff states a claim under the ICFA independent of his TCPA claim. He simply cites to the TCPA as one way of showing that the text messaging scheme is "unfair" because it is contrary to public policy. Beyond that, Defendant is simply mistaken that the only predicate statutory violations for an ICFA claim are found in 815 ILCS 505/2Z, which merely lists statutes giving rise to a *per se* unlawful act. Moreover, given the FCC's recent interpretive guidance about who is the "maker" of a call with respect to apps, Defendant cannot seriously contend that the TCPA was "unsettled" when Mr. Warciak's claim arose. Defendant's final argument—that Mr. Warciak has failed to allege actual damages—is flatly contradicted by the well-pleaded allegations of the Complaint.

For all these reasons, Defendant's motion to dismiss should be denied in its entirety.

## II.    BACKGROUND

### A.    Defendant's After School App and "spam-viting" scheme.

Defendant owns and operates After School, an anonymous social network geared toward high school students. (*See* Compl. ¶ 1.) After School's focus on anonymous speech has generated substantial controversy. (*See id.* ¶¶ 12, 25.) In late 2014, the App was banned from Apple's App Store because of numerous incidents of cyberbullying and threats of school violence.[2] (*See* ¶ 25.)

---

[2]      *See* Matt Burns, *After School App Again Pulled from the App Store after More School Shooting Threats*, TechCrunch, Dec. 11, 2014, https://techcrunch.com/2014/12/11/after-school-app-again-pulled-by-apple-after-more-school-shooting-threats/.

Since reemerging onto the highly competitive social media scene, Defendant has gone to great lengths to grow After School's user base, attract new investors, and raise capital. (*Id.*) Its efforts appear to be working. Today, Defendant touts millions of users and has reported raising over $16 million in funding. (*Id.* ¶¶ 12, 24, 25.)

To foist the App on as many potential users as possible, as noted above, Defendant engages in an aggressive marketing practice known as "spam-viting." (*See id.* ¶¶ 24–25.) Spam-viting is the practice of taking users' contact lists and using them to send computer-generated invitation messages to the users' friends and family, often without the users' knowledge and, in the most egregious instances, after explicitly telling users that the apps won't contact others. The ultimate goal is to invite as many potential users as possible, which increases the likelihood of converting new users. (*See id.* ¶¶ 24–25.)

Here's how the process works: When a potential user signs up for the App by opening it, it requests access to the user's location to find nearby high schools. (*See id.* Figs. 1, 2 ("To find your school, the app needs your location").) It then instructs the user to select a school from a list that appears on screen. (*Id.* ¶ 14.) Once the user has selected a school, Defendant prompts the user to verify his or her status as a student there. (*Id.* ¶¶ 14, 15.) First, Defendant seeks access to the user's Facebook profile. (*Id.* ¶ 15 Fig. 4 ("I'm a student[.] Verify now with Facebook").) Second, Defendant requires that the user identify their classmates from a list generated from their phone's contacts.[3] (*Id.* ¶ 16.) In seeking to access the users' contacts, the App informs the user as follows: "To verify you are a student, you must identify your classmates from the contacts." (*See*

---

[3]      Defendant suggests that Plaintiff intentionally omits this step in the complaint because it's supposedly damaging to the story. (Def.'s Mem. at 2 n.1.) That's simply not the case and, if anything, that additional step only further supports Plaintiff's position that the process is misleading. That is, while the onscreen prompt asks a user to identify contacts to "verify" his or her status as a high school student, that's not what Defendant is actually hoping to achieve. Rather, identifying contacts results in the sending of invitational text messages—something that is never mentioned.

Ex. A to Def.'s Mem.) The onscreen prompt then instructs users to "Identify classmates in contacts to prove I'm a student," and at no point does it inform the user that any text messages or other communications will be transmitted. (Compl. ¶ 16 Fig. 5.) Then, on a page entitled "Student Verification," the user sees a list that includes both actual contacts as well as a number of fictitious persons. (*Id.* ¶ 16.) Defendant requires that the user select at least four "students" before completing the "verification" process. (*Id.*) However, it makes no difference whether the user clicks on a student or any other contact—either way, the user will pass the "verification test" so long as four real-world contacts are selected. (*Id.*) In other words, the "verification test" is nothing more than a scheme to obtain access to a user's contacts for the purpose of sending invitation text messages.

As soon as the user makes his or her selections on the "Student Verification" page, Defendant transmits a text message to each selected person. (*Id.* ¶ 17.) To do so, the phone numbers of the selected persons are transmitted to Defendant's servers and routed to its text messaging system. (*Id.* ¶ 18.) From there, Defendant generates the text message content. (*Id.* ¶ 18–21.) The generic messages inform the selected person that they were "picked" by an anonymous "boy" or "girl" and include a smiling "love" emoji. (*Id.* ¶ 19.) They direct the recipient to a page on the After School website, which contains information about how to download the App. (*Id.* ¶ 19.) Once the text message is composed, Defendant transmits it to recipients from a phone number that it operates or controls. (*Id.* ¶ 20.)

### B. Mr. Warciak's experience.

On June 6, 2016, Defendant transmitted a message to Mr. Warciak's cellular telephone promoting the App. (*Id.* ¶ 30.) The message, which originated from the San Francisco-based telephone number (415) 855-2391, informed Mr. Warciak that "an anonymous boy" had picked

him on the App. (*Id.* ¶ 30 Fig. 10.) It contained the mysterious, smiling "love" emoji, as well as a hyperlink to a page on the App's website. (*Id.*) Mr. Warciak—who has never used the After School App—never provided his cellular telephone number to Defendant, nor did he ever provide any form of prior express consent to receive Defendant's text messages. (*Id.* ¶ 31.)

## III. LEGAL STANDARD

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Detailed factual allegations are not required, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a defendant's Rule 12(b)(6) motion, a court construes the complaint in the light most favorable to the plaintiff, accepting all well-pleaded facts as true, and drawing all reasonable inferences in the plaintiff's favor. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837 (7th Cir. 2010).

## IV. ARGUMENT

### A. Mr. Warciak states a TCPA claim because, under the "totality of the facts and circumstances" of this case—in which App users had no idea that they were inviting anyone to do anything—Defendant made the text message calls.

Defendant argues that it that it can't be held liable for the subject text messages because they were initiated by the users of the App. Relying on the 2015 Order and two out-of-circuit opinions, Defendant more or less argues that because users have control over selecting the contacts to whom text messages are sent, users should be the ones deemed to have "initiated" the text messages. But unlike in any of the cases that Defendant relies upon, here Defendant does not merely fail to tell users *how* invitations would be sent to their contacts, (*id.*)—it conceals and

5

misrepresents the fact that invitations—of any sort in any form—would be sent at all. Because users are never informed of the existence of invitations, they are necessarily incapable of making an intentional decision. Thus, it is clear that under the totality of these facts and circumstances, it Defendant—not App users—made the text message calls, and that Plaintiff has stated a claim under the TCPA.

### 1. *The TCPA and the 2015 Order.*

The TCPA makes it unlawful "to make any call (other than a . . . made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).[4] Congress enacted the TCPA in 1991 to protect consumers from the "nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate," *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* (the "2015 Order"), 30 F.C.C. Rcd. 7961, 7979–80 ¶ 29 (July 10, 2015), and vested the FCC with the authority to prescribe regulations to fulfill this goal, *see* 47 U.S.C. § 227(b)(2). Through both judicial decision-making and the FCC's guidance, the statute continues to evolve in response to changing technology. *See e.g.*, *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) (holding that a text message is a "call" within the meaning of the statute); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14093 ¶ 134 (July 3, 2003) (expanding the definition of an ATDS to encompass new predictive dialing technology).

In its 2015 Order, the FCC addressed another new communications technology—mobile

---

[4]       The statute defines an "automatic telephone dialing system" ("ATDS") as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Defendant does not challenge whether Mr. Warciak has plausibly alleged the use of such equipment. Instead, its sole challenge to the TCPA count is whether Mr. Warciak has plausibly alleged that Defendant is the "maker" of the text message calls under 47 U.S.C. § 227(b)(1)(A)(iii).

apps that transmit text messages—and addressed who "makes" or "initiates" the call when such text messages are sent. *See* 2015 Order, 30 F.C.C. Rcd. at 7978–7984 ¶¶ 25–37. Noting that neither it nor the statute had ever defined the terms "make" or "initiate," the FCC reiterated the "'initiate' suggests some 'direct connection between a person or entity and the making of a call.'" *Id.* at 7980 ¶ 29 (citation omitted). Such a connection may be present where person or entity takes the necessary steps to physically place a call, or where a person or entity is "so involved in placing the call as to be deemed to have initiated it." *Id.* at 7980 ¶ 30. The FCC cautioned that the determination of who makes or initiates a call must be made "look[ing] to the totality of the facts and circumstances surrounding the placing of a particular call," and "considering the goals and purposes of the TCPA." *Id.*

The FCC then put these principles into practice across a spectrum of three texting apps—YouMail, TextMe, and Glide. With respect to YouMail, a mobile app that enables users to set up auto-reply text messages in response to voicemails, the FCC held that app users "made" the text message calls because they determined whether to send the text messages, which callers should receive them, and how their name should appear in the message, while YouMail "exercise[d] no discernible involvement in deciding whether, when, or to whom an auto-reply is sent, or what such an auto reply says, nor [did] it perform related functions, such as pre-setting options in the app, that physically cause auto-replies to be sent." *Id.* at 7981–82 ¶ 31. The FCC reached the same conclusion with respect to TextMe, a texting app, because users had to make several "affirmative choices," including tapping a button to "invite" friends, "individually select[ing] contacts," and "choos[ing] to send the invitational text message by selecting another button." *Id.* at 7983–84 ¶¶ 36–37. With respect to the video messaging app Glide, however, the FCC reached the opposite conclusion, finding Glide to have "made" the text message calls by automatically

7

sending invitational text messages to "every contact in the app user's contact list with little or no obvious control by the user." *Id.* at 7983 ¶ 35.

### 2. The fact that users were deceived into selecting contacts so that Defendant could send invitation texts makes Defendant subject to liability under the TCPA.

From the FCC's careful reasoning, Defendant arrives at a single, misguided conclusion: "[t]he After School App [is] in the category of TextMe, and outside the reach of the TCPA," because the App "does not send a mass text to all of the user's contacts," and instead "the user makes that selection." (Def.'s Mem. at 6.) Defendant is mistaken. The 2015 Order never established a bright-line rule that only those app developers who "spam-vite" entire address books at a time are "makers" of a call. To the contrary, the FCC clearly instructed courts to "look to the totality of the facts and circumstances surrounding the placing of a particular call," and "consider[] the goals and purposes of the TCPA." 2015 Order, 30 F.C.C. Rcd. at 7980 ¶ 30. Here, Defendant misled App users to believe that they were selecting contacts to "prove" their student status. (*See* Compl. ¶ 17, Fig. 5 ("Identify class mates in contacts to prove I'm a student."); *see also* Ex. A to Def.'s Mem. ("To verify you are a student, you must identify your classmates from the contacts.").) But, in actuality, Defendant was just trying to gain access to the users' contacts so that it could send invitational text messages. Users of the App thus had no idea that they were inviting anyone at all—much less did they have any control over the content of the text message invitation, or whether and when it would be sent. Under these unique facts and circumstances, the After School App user, like the Glide App user, "plays no discernible role in deciding whether to send the invitational text messages, to whom to send them, or what to say in them." *Id.* at 7984 ¶ 35. And, in orchestrating this deceptive process, drafting the text messages, and transmitting them when it chooses, it is Defendant who "tak[es] the steps

physically necessary to send each invitational text message or, at a minimum, is so involved in doing so as to be deemed to have made or initiated them."[5] *Id.*

### 3. Defendant cannot evade TCPA liability by failing to inform App users that invitations would be sent to their contacts.

Defendant spends the next several pages building up the straw man argument that "it makes no difference . . . whether an application informs a user *how* invitations will be sent." (Def.'s Mem. at 6) (quoting *Cour v. Life360, Inc.*, No. 16-CV-00805-TEH, 2016 WL 4039279, at *4 (N.D. Cal. July 28, 2016)) (internal quotations omitted) (emphasis added). But what sets this App apart from each and every other one that courts and the FCC have considered is not the fact that users are never informed *how invitations will be sent*—it is the fact that they are never informed invitations *will be sent at all.* The two out-of-circuit cases that Defendant relies on are readily distinguishable on this basis. In *Cour*, the United States District Court for the Northern District of California found that app users initiated text message calls because they had to (1) indicate their willingness to share contacts, (2) choose which pre-selected contacts they wanted to invite, and (3) click a button clearly labeled "invite." 2016 WL 4039279, at *4. The court rejected the argument that an app user must know *how* invitations will be transmitted—by text, Facebook, email, or some other means—in order to be responsible for sending them. *Id.* However, nothing in the Court's analysis even remotely suggests that app users who do not know *the fact that* invitations will be transmitted share equal responsibility.

---

[5]  Relying on *Huricks v. Shopkick, Inc.*, No. C-14-2464 MMC, 2015 WL 5013299, at *2 (N.D. Cal. Aug. 24, 2015), *appeal dismissed* (Jan. 26, 2016), Defendant also argues that "the app operator's control over the content of a text message" does not "transform the app into the initiator of a text under the TCPA." (Mem. at 9.) But this analysis again misses the mark because it disregards the FCC's instruction to consider the "totality of the facts and circumstances." 2015 Order, 30 F.C.C. Rcd. at 7980 ¶ 30. The content of the text message was just one factor among many that the *Huricks* court considered, noting that Shopkick's control of the text messages' content "weigh[ed] in favor of finding Shopkick to be the sender of the texts." *Huricks*, 2015 WL 5013299, at *3.

*Wright v. Lyft, Inc.* is likewise of little help to Defendant. There, the plaintiff attempted to distinguish the Lyft app from TextMe by arguing that Lyft failed to tell users "whether an 'invite' would be sent by U.S. Mail, email, a personal phone call, or some other method." *Wright v. Lyft, Inc.*, No. 2:14-cv-00421, Dkt. 63 at 5 (W.D. Wash May 15, 2016) (citations and internal quotations omitted) (attached as Ex. B to Def.'s Mem.). The United States District Court for the Western District of Washington rejected this distinction, reasoning that an app user would know that the plaintiff would receive some form of communication as soon as she clicked a button clearly labeled "Send Invite." *Id.* Here, in contrast, App users are not merely kept in the dark about *how* invitations will be sent—they are never informed that invitations *will* be sent at all, and are instead led to believe they must select contacts to "prove" or "verify" their student status. (*See* Compl. ¶ 17, Fig. 5; Ex. A to Def.'s Mem.). Even if it "makes no difference . . . whether an application informs a user *how* invitations will be sent," as Defendant argues, (Def.'s Mem. at 6), it makes a different whether an application informs a user *that* invitations will be sent.

#### 4.     *App users made no "affirmative choices" to send text messages.*

Defendant's final argument is that by clicking names in their smartphones' address books, App users made one of several "affirmative choices" that absolve Defendant of liability. (*Id.* at 9.) Defendant is again mistaken.

"Affirmative" means "resulting from an intentional act." *Affirmative*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/affirmative (last visited Oct. 20, 2016). An app user therefore cannot make an affirmative choice when he or she does not know what that choice entails. Unsurprisingly, in each case where app users have been found to have "made" text message calls, they were clearly informed that some form of invitation would be sent. *See, e.g.*, 2015 Order, 30 F.C.C. Rcd. at  7983–84 ¶¶ 36–37 (TextMe users had to click

button labeled "invite your friends," then another button to choose to send the text message); *Cour*, 2016 WL 4039279, at *3 (Life360 users had to click button labeled "invite" after selecting contacts); *Wright*, 2:14-cv-00421, Dkt. 63 at 5 (Lyft users had to click button labeled "Send Invite"); *Huricks*, 2015 WL 5013299, at *3 (Shopkick users had to click button labeled "Invite Friends" after selecting contacts and reviewing invitation format). Here, App users who were told to select contacts to "prove" or "verify" their student status could not have made the "affirmative" choice to send a text message to those persons. The fact that the users also made a certain quantity of choices, (*see* Def.'s Mem. at 9), is immaterial given that App users were misled about what they they were choosing to do.

Defendant assumes that "any After School App user in operating a communication app would certainly expect that the people she selected would receive a communication as a result of that selection." (Def.'s Mem. at 9.) This assumption is erroneous on multiple levels. After School is, first and foremost, a social network. (*See* Comp. ¶¶ 1, 12.) Defendant has no basis for asserting that users of social networks—such as Facebook or LinkedIn—assume that their apps will send out communications every time they click on a contact. Moreover, Defendant deliberately misinformed App users that they were selecting contacts to "prove" or "verify" their student status. (*See* Compl. ¶ 17, Fig. 5; Ex. A to Def.'s Mem.) Presented with this misleading information, an App user would have absolutely no reason to "certainly expect that the people she selected would receive a communication." (*See* Def.'s Mem. at 9.)

Never told that invitations would be sent, and misinformed about why they were to click their contacts, App users did not make the "affirmative choice" to send the text messages. By engineering the App to mislead users every step of the registration process, Mr. Warciak has plausibly alleged that Defendant "made" the text message calls. Defendant's motion to dismiss

11

should therefore be denied.

     **B.**     **Mr. Warciak states an ICFA claim because the sending of unsolicited text messages is an unfair business practice and because he has sufficiently pleaded actual damages.**

          *1.*     *Mr. Warciak has plausibly alleged that Defendant engaged in an unfair business practice.*

Defendant contends that an ICFA claim cannot be premised on the TCPA because the statute (1) is not enumerated in 815 ILCS 505/2Z, and (2) is "unsettled." (Def.'s Mem. at 10–13.) Both arguments lack merit.

The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including the "misrepresentation or the concealment, suppression or omission of any material fact . . . in the conduct of any trade or commerce." 815 ILCS 505/2Z. Illinois courts examine three factors to determine whether a practice is "unfair" under the ICFA: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002) (citation omitted). As an initial matter, Mr. Warciak does not rely solely on the TCPA to allege a violation of the ICFA. Rather, he cites the TCPA to support his contention that Defendant's business practice is "unfair" because it offends public policy. (Compl. ¶ 55.) *See Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortgage Loan Trust, Series 2003-1*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) (explaining that a practice may offend public policy "if it violates a standard of conduct contained in an existing statute."). He also contends that the unsolicited text messages are unfair because they are "deceptive" and "cause substantial injury." (Compl. ¶ 54.) Defendant's alleged TCPA violation is thus not the sole reason why Defendant's conduct violates the ICFA.

Even if Mr. Warciak's ICFA claim depended on his TCPA claim, the TCPA need not be

listed in Section 505/2Z, which "simply creates a *per se* rule that a defendant's *knowing* violation of any of the enumerated statutes *automatically* constitutes an unfair practice." *Boyd*, 787 F. Supp. 2d at 755. A plaintiff may nevertheless "independently state a claim under the Act." *W. Ry. Devices Corp. v. Lusida Rubber Products, Inc.*, 06 C 0052, 2006 WL 1697119, at *3 (N.D. Ill. June 13, 2006). Defendant fails to acknowledge that in *Martis v. Pekin Memorial Hospital, Inc.*, despite holding that there was no *per se* ICFA violation because the Medical Practice Act was not listed in Section 505/2Z, the court went on to analyze whether the conduct at issue was independently unfair or deceptive. *See* 917 N.E.2d 598, 604–06 (Ill. App. Ct. 2009).

Turning to Defendant's next argument, the TCPA is not "unsettled." (Def.'s Mem. at 11.) The FCC has made clear that determining whether an app user or app company initiates a text message must be decided on a case-by-case basis, looking at the totality of the facts and circumstances. 2015 Order, 30 F.C.C. Rcd. at 7980 ¶ 30. Accordingly—a year before Mr. Warciak filed suit—the FCC directed courts to determine "(1) who took the steps necessary to physically place the call; and (2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it." *Id.* The TCPA is therefore not "unsettled" in terms of who is the "maker" of a call, and thus distinct from the "largely unconstrued" statutes at issue in the cases on which Defendant relies. (*See* Def.'s Mem. at 10–12.) In one, later affirmed by the Illinois Supreme Court, the defendant "merely made an honest mistake concerning the interpretation of a statute that had yet to be construed," *Stern v. Norwest Mortg., Inc.*, 688 N.E.2d 99, 104 (Ill. 1997)), and in another, the statute was so uncertain that the Illinois Appellate Court had misinterpreted it, *see Lee v. Nationwide Cassel, L.P.*, 675 N.E.2d 599, 604 (Ill. 1996). Here, Defendant cannot claim that it made an honest mistake in interpreting the TCPA when it deceptively prompted users to "prove" their student status, nor can it argue that the TCPA is

"uncertain" in light of the FCC's guidance.

Because Mr. Warciak has asserted an ICFA claim independent of the TCPA, which need not be listed in Section 505/2Z and is not "unsettled," Defendant's motion should be denied.

### 2. Mr. Warciak has adequately pleaded actual damages.

Finally, Defendant claims that Mr. Warciak has failed to plead actual damages, (Def.'s Mem. at 13), disregarding the detailed allegations set forth in the Complaint.

To state a claim under the ICFA, a plaintiff must allege actual damages. *Morris v. Harvey Cycle & Camper, Inc.*, 911 N.E.2d 1049, 1053 (Ill. App. Ct. 2009) (citing 815 ILCS 505/10a(a)). While emotional distress and aggravation do not qualify, *see id.*, individual damages need not be substantial. *See G.M. Sign, Inc. v. MFG.com, Inc.*, No. 08 C 7106, 2009 WL 1137751, at *4 (N.D. Ill. Apr. 24, 2009) (explaining that "the fact that these damages might be small for [plaintiff] alone" did not preclude ICFA claim); *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 779 (N.D. Ill. 2008) (economic injury caused by unsolicited fax "may be a minute injury, but it is an injury nonetheless"). Disregarding damages as *de minimis* "would conflict with the ICFA's remedial purpose, because it would allow defendants to freely engage in unfair practices so long as the effects were spread thinly over a large population of victims." *Centerline*, 545 F. Supp. 23d at 779.

Here, Mr. Warciak alleges that he and the members of the Illinois Subclass he seeks to represent suffered actual damages and costs associated with receiving Defendant's text messages, including the "diminished value and utility" of their phones and phone plans, "measurable amounts of time lost" answering and deleting the text messages, as well as lost battery charge, lost battery lifespan, and recharge costs. (Compl. ¶ 56.) Unlike the claims for emotional distress, "increased usage of [plaintiff's] cell service," and "actual damages" asserted

14

in the cases on which Defendant relies, *see Nelson v. Ashford Univ., LLC*, No. 16-CV-3491, 2016 WL 4530325, at *3 (N.D. Ill. Aug. 29, 2016); *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 913 (N.D. Ill. 2012), these losses are specific and quantifiable.

Courts in this district and elsewhere have allowed analogous claims to move forward based on similar allegations. *See, e.g.*, *Centerline*, 545 F. Supp. 2d 768 (finding allegations of wasted toner and fax paper, wear and on fax machine, and lost time sufficient for ICFA claim); *In re Google, Inc. Privacy Policy Litig.*, No. C-12- 01382-PSG, 2013 WL 6248499, at *7 (N.D. Cal. Dec. 3, 2013) (finding allegations of lost battery life and bandwidth consumption sufficient "economic injury" for claim under California's Unfair Competition Law, which like the ICFA, requires actual damages). Indeed, the very case that Defendant appends to its memorandum— *Wright*—allowed a claim under Washington's consumer protection statute to move forward where Plaintiff had made only one "sweeping claim of injury"—that the transmission of numerous unsolicited text messages burdened the entire cellular infrastructure, causing costs for consumers to go up. *See* No. 2:14-cv-00421, Dkt. 63 at 11 ("These claims are not implausible and the Court finds they are injuries to property (i.e. Plaintiff's financial resources) . . . .").

Accordingly, because Plaintiff has plausibly alleged specific, actual damages in his Complaint, Defendant's motion to dismiss his ICFA claim should be denied.

## V. CONCLUSION

For all the reasons stated above, Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss in its entirety, or in the alternative, grant him leave to amend.[6]

---

[6]    In the event that the Court grants Defendant's motion to dismiss (partially or otherwise), Plaintiff respectfully requests that the Court grant him leave to add further detail or otherwise take the necessary steps to cure any defects found by the Court in his pleadings.

Dated: October 20, 2016

Respectfully submitted,

**MATTHEW WARCIAK,** individually and on behalf all others similarly situated,

By: <u>s/ Benjamin S. Thomassen</u>
    One of Plaintiff's attorneys

Benjamin H. Richman
brichman@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Elizabeth A. Winkowski
ewinkowski@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

16

## CERTIFICATE OF SERVICE

    I, Benjamin S. Thomassen, an attorney, hereby certify that on October 20, 2016, I served the above and foregoing to by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

s/ Benjamin S. Thomassen      